IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JOZEF BATOG,                        §
                                    §
        Plaintiff,                  §
                                    §
v.                                  §        CIVIL NO. H-04-2532
                                    §
JO ANNE B. BARNHART,                §
COMMISSIONER OF THE SOCIAL          §
SECURITY ADMINISTRATION,            §
                                    §
        Defendant.                  §

## MEMORANDUM OPINION

Pending before the court[1] are Defendant's Motion for Summary Judgment and Plaintiff's Motion for Summary Judgment. The court has considered the motions, all relevant filings, the administrative record, and the applicable law. For the reasons set forth below, Defendant's Motion for Summary Judgment (Docket Entry No. 17) is **GRANTED** and Plaintiff's Motion for Summary Judgment (Docket Entry No. 15) is **DENIED**.

### I. Case Background

**A.   Procedural History**

Plaintiff Jozef Batog ("Plaintiff") filed this action pursuant to 42 U.S.C. § 405(g) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration

---

[1]     This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Fed. R. Civ. P. 72.  Docket Entry No. 13.

("Commissioner") regarding Plaintiff's claim for disability insurance benefits under Title II of the Social Security Act ("the Act").

Plaintiff protectively filed for disability benefits on January 25, 2002.[2] Plaintiff claimed that he was unable to work as of April 1, 2001, due to vision problems, diabetes, and neuropathy.[3] After Plaintiff's application was denied at the initial[4] and reconsideration levels,[5] he requested a hearing before an Administrative Law Judge ("ALJ").[6] Plaintiff was represented by counsel at the hearing.[7] During the hearing on January 7, 2004, Plaintiff and a vocational expert testified.[8] On January 29, 2004, the ALJ found Plaintiff was not disabled at any time during the period covered by his application because he could still perform relevant past work.[9] On May 20, 2004, the Appeals Council denied Plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner.  Having exhausted his administrative remedies, Plaintiff brought this timely civil action

---

[2]   Transcript of the Administrative Proceedings ("Tr.") 52.

[3]   Tr. 42, 65.

[4]   Tr. 28.  The initial disability determination by a state agency is dated April 4, 2002.  Tr. 28.

[5]   Tr. 29.  The reconsideration of disability by a state agency is dated May 28, 2002.  Tr. 29.

[6]   Tr. 42-43, 47.

[7]   Tr. 26, 187.

[8]   Tr. 185.

[9]   Tr. 25.

for review of the Commissioner's decision.

**B.    Factual History and Relevant Medical Record**

Plaintiff was born on July 27, 1947, and was fifty-three years old on the date of the alleged onset of disability.[10]  Plaintiff possesses a high school education.[11]  Prior to the alleged onset of his disability, Plaintiff was employed as a cabinet maker and then as a dental technician.[12]

In Plaintiff's Disability Report, filed by Plaintiff in support of his application for disability benefits, he stated that after prolonged visual concentration, such as looking at objects for fifteen minutes, he would begin to see things floating in his eye and shortly thereafter would get a headache.[13]  Plaintiff stated that he also has a prosthetic right eye.[14]  Even though he wears corrective lenses for his functional left eye, Plaintiff claimed he was only able to only look at objects for five to ten minutes, and that he was sensitive to light.[15]  At the hearing, Plaintiff testified that starting approximately three years before the hearing date, in 2001, he began experiencing these symptoms, and that it got to the point where Plaintiff began to black out on the

---

[10]    Tr. 52.

[11]    Tr. 189.

[12]    Tr. 65, 189.

[13]    Tr. 65.

[14]    Tr. 65.

[15]    Tr. 193.

road.[16]

Plaintiff stated that when he went to the hospital, he was told he had high blood pressure and high cholesterol.[17]  Plaintiff further stated that he occasionally had chest pains and had arthritis.[18]  Plaintiff reported taking "a lot" of medicine.[19] Plaintiff stated he was able to walk, upon the recommendation of his physician for his heart condition, mostly around his back yard but not down the street, and that his wife did most of the household chores.[20]

Plaintiff's medical record partially supports the testimony regarding his physical ailments.  With regards to Plaintiff's visual ailments,[21] Amer R. Diab, O.D.T., ("Dr. Diab") wrote on March 7, 2002 that Plaintiff was uniocular,[22] with an artificial glass right eye, and his remaining left eye was hyperopic presbyope.[23] His uncorrected long distance vision was stated to be 20/50, and

---

[16]     Tr. 189.

[17]     Tr. 189.

[18]     Tr. 190, 191, 193.

[19]     Tr. 190.  The record indicates Plaintiff took a total of ten different medications at the time of the hearing, seven of which were related to his cardiac condition, as well Celebrex, Tylenol and Advil for his hand pain and headaches.  Tr. 184.

[20]     Tr. 190.

[21]     Tr. 88.

[22]     In other words, having only one eye.  Tr. 89.

[23]     Tr. 89.  Hyperopia is medical term for farsightedness. MOSBY'S POCKET DICTIONARY OF MEDICINE, NURSING & ALLIED HEALTH ("MOSBYS'") 439 (1st Ed. 1990). Presbyopia is farsightedness "resulting from a loss of elasticity of the lens of the eye... commonly develop[ing] with advancing age." MOSBY'S at 721.

near vision to be 20/200; with Plaintiff's prescribed bifocals, Dr.
Diab stated that his vision in both cases, far and near, was
20/20.[24]   Attached were the prescriptions from three eye exams,
administered by Dr. Diab on January 22, 2001, November 19, 1999,
and January 15, 1999.[25]   A fourth eye exam was performed by Michael
Pickering, O.D., ("Dr. Pickering") on March 5, 2002.[26]   In
information submitted by Plaintiff during this exam, he reiterated
his visual ailments.[27]   A consultative examination and report by
Barry N. Hyman, M.D., ("Dr. Hyman") dated March 19, 2002, stated
that Plaintiff had contracted visual field and photophobia[28] in
Plaintiff's left eye; the report further stated that examination
was difficult because of marked photophobia.[29]   It recommended that
the treatment be to "follow up [illegible] ophthalmologist."[30]

Shortly after the date of Dr. Hyman's report, Frank H. Gregg,
M.D., ("Dr. Gregg") completed an assessment form dated March 29,
2002, in which he stated that Plaintiff's visual impairments were

---

[24]   Tr. 89.  A person who can read at 20 feet a Snellen chart what the
average person can read is said to have "20/20" vision. MOSBY'S at 825. A Snellen
chart is one of several charts used to test visual acuity, consisting of letters,
numbers or symbols arranged in decreasing size from top to bottom.  MOSBY'S at
825.

[25]   Tr. 90-92.

[26]   Tr. 99-102.

[27]   Tr. 100.

[28]   Photophobia is an abnormal sensitivity to light, especially in the
eyes.  MOSBY'S at 690.

[29]   Tr. 94.

[30]   Tr. 94.

non-severe, that there "were no objective clinical findings to support the apparent visual field restriction suggested by subjective test responses to confrontation and Goldman testing," and that "alleged limitations are not fully supported by available evidence."[31]   This assessment and related evidence on file was reviewed and affirmed by George L. John, M.D. ("Dr. John").[32]   This form also referred to a report of a telephone conversation that Dr. Gregg had with Dr. Hyman.[33]   In this report, Dr. Gregg noted that Dr. Hyman stated that there were no objective clinical findings that would support the apparent visual field restriction for the left eye.[34]   Finally, on July 5, 2002, Plaintiff was examined at the Texas Eye Institute.[35]   The written assessment stated that Plaintiff had an early cataract and possible defective smooth pursuit movement in his left eye, and that his near vision was correctable to 20/30, and recommended a treatment plan consisting of a prescription for reading glasses per the Plaintiff's request, an emphasis on eye protection, and a recommendation that Plaintiff have a general physical.[36]

---

[31]   Tr. 97.

[32]   Tr. 97.

[33]   Tr. 97, 98.

[34]   Tr. 98.

[35]   Tr. 104-06.

[36]   Tr. 105. Smooth pursuit eye movement is defined as "the tracking of the eyes following a slowly moving object at a steady coordinated velocity, rather than in saccades." MOSBY'S at 824-25.  Saccades is defined as something "pertaining to something jerky, broken, abrupt, such as rapid shifts of eye movement or a staccato voice." MOSBY'S at 788.

With regard to Plaintiff's other conditions, Plaintiff was examined by Hanh Truong, M.D., ("Dr. Truong") after complaining of chest pains.[37]  Plaintiff indicated that he had not seen a physician prior to this in over ten years.[38]  A diagnosis of coronary atherosclerosis, intermediate coronary syndrome, and hypertension was made after a catheterization on July 12, 2002, by Sherman Tang, M.D., ("Dr. Tang").[39]  A follow-up examination on September 11, 2003, indicated that Plaintiff's coronary artery disease and hypertension was stable and that his drug treatment regimen was to continue.[40]

With regard to Plaintiff's complaint of pain in his joints, Richard Vanik, M.D., ("Dr. Vanik") examined Plaintiff and found that while Plaintiff's left hand had scars and other signs of damage, it had excellent range of motion, though with some numbness.[41]  Dr. Vanik noted that the x-rays were "unremarkable."[42]  Dr. Vanik then concluded that Plaintiff "most likely ha[d] either tendinitis or possibly an early osteoarthritis," and prescribed steroid injections.[43]

**C.   Administrative Hearing Testimony**

---

[37]     Tr. 125.

[38]     Tr. 114.

[39]     Tr. 115.

[40]     Tr. 163.

[41]     Tr. 151.

[42]     Tr. 151.

[43]     Tr. 151.

Byron Pettengill, the vocational expert ("VE"), testified that Plaintiff's job before his application for disability benefits, as a dental technician, was a skilled occupation customarily performed at the light exertional level, while his work prior to that, as a cabinet maker, was a skilled occupation customarily performed at the medium exertional level.[44]

When posed by the ALJ with the question of whether someone who could perform light work and had 20/30 monocular vision could perform any of Plaintiff's past work, the VE responded that such a person would be able to do the work of a dental technician.[45] When the ALJ modified the hypothetical to add the condition of needing to avoid dangerous machinery and driving, the VE's response continued to be that such a person could still be able to do the work of a dental technician.[46]

The VE testified that Plaintiff could perform past relevant work and that Plaintiff's skills could also be transferred to sedentary work such as an order or requisition clerk.[47] The VE elaborated further and opined that there were approximately 500 order clerk positions and 300 requisition clerk positions in the local economy, and approximately 50,000 positions and 30,000 positions, respectively, in the national economy, and that the

---

[44]    Tr. 195.

[45]    Tr. 195.

[46]    Tr. 195-96.

[47]    Tr. 195.

numbers stated constituted a "very large percentage" of the jobs to which Plaintiff's skills could transfer.[48]

After hearing the testimony and reviewing the medical record, the ALJ found that Plaintiff was not disabled at any time during the period covered by his application because he was "able to perform his past relevant work."[49]  The Appeals Council approved the ALJ's decision, thereby transforming it into the final decision of the Commissioner.[50]  Plaintiff then timely sought judicial review of the decision by this court.

## II. Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner to deny disability benefits is limited to two issues: 1) whether proper legal standards were used to evaluate the evidence; and 2) whether substantial record evidence supports the decision.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002); Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).

The widely accepted definition of "substantial evidence" is "something more than a scintilla but less than a preponderance." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000); Brown, 192 F.3d at 496.  In applying this standard, the court is to review the entire record, but the court may not re-weigh the evidence, decide the issues de novo, or substitute the court's judgment for the

---

[48]    Tr. 200.

[49]    Tr. 24.

[50]    Tr. 4-6.

Commissioner's judgment. <u>Brown</u>, 192 F.3d at 496.  The Commissioner is given the responsibility of deciding any conflicts in the evidence.   <u>Id.</u>  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."  42 U.S.C. § 405 (g).  Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.  <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988).  In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.   <u>Brown</u>, 192 F.3d at 496.

The legal standard for determining disability under the Act is whether the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 [("the Listings")] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he

has done in the past must be found "not disabled;" and
(5) if the claimant is unable to perform his previous
work as a result of his impairment, then factors such as
his age, education, past work experience, and residual
functional capacity [("RFC")] must be considered to
determine whether he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20

C.F.R. § 404.1520(a)(4).

   To be entitled to benefits, a claimant bears the burden of
proving he is disabled within the meaning of the Act.   Wren v.
Sullivan, 925 F.2d 123, 125 (5th Cir. 1991).  By judicial practice,
this translates into the claimant bearing the burden of proof on
the first four of the above steps and the Commissioner bearing it
on the fifth.   Brown, 192 F.3d at 498; Greenspan v. Shalala, 38
F.3d 232, 236 (5th Cir. 1994), cert. denied, 514 U.S. 1120 (1995).
The analysis stops at any point in the five-step process upon a
finding at any step that the claimant is or is not disabled.
Greenspan, 38 F.3d at 236.

### III. Analysis

   In his formal decision, the ALJ first noted that Plaintiff had
met the disability insured status requirements of the Act from the
alleged onset date of disability through the date of decision.[51]
He then followed the five-step process outlined in the regulations,
finding at the first step that Plaintiff had not engaged in any
substantial gainful activity since his alleged onset date of

---

[51]      Tr. 25.

11

disability, April 1, 2001.[52]  At step two, the ALJ found that
Plaintiff had several severe medically determinable impairments,
namely coronary atherosclerosis, diabetes mellitus, hypertension,
and monocular vision.[53]  At step three, the ALJ determined that the
impairments, singly or in combination, did not meet or equal in
severity the medical criteria for any impairment described in the
Listings and ,therefore, were not presumptively disabling under the
Act.[54]

The ALJ then took into consideration the information contained
in Plaintiff's medical records, as well as testimony presented at
the hearing, and found at step four that Plaintiff retained a RFC
to perform light work which did not involve exposure to dangerous
machinery.[55]

Continuing on step four, the ALJ weighed the credibility of
Plaintiff's allegations with clinical and laboratory findings as
well as the record as a whole.  He found that the testimony given
by Plaintiff at the hearing was not wholly credible or supported by
the objective medical evidence.[56]  Specifically, the ALJ found that
Plaintiff had no medical conditions that would preclude light

---

[52]   Tr. 25.

[53]   Tr. 22-23, 25.

[54]   Tr. 22, 25.

[55]   Tr. 23, 25.

[56]   Tr. 23, 25.

12

work.[57]  The ALJ noted that Plaintiff had corrected vision of 20/30 in his left eye, there was no objective evidence of a visual field restriction, his coronary artery disease was mild, and that he only had tendinitis or early osteoarthritis in his hands.[58]  He further found that there was no medical evidence to support the claim of photosensitivity.[59]  Finally, the ALJ found that Plaintiff's daily activities, such as walking, sitting, listening to the radio, and cooking, were consistent with the ability to perform light work, and that Plaintiff did not claim that he was not limited in his abilities to sit, stand, or walk.[60]

For the reasons above, the ALJ concluded that Plaintiff could perform his past relevant work as a dental technician.[61]  Therefore, the ALJ concluded that Plaintiff had not been under a disability as defined by the Act at any time on or before the date of his decision.[62]

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.  Plaintiff contends that the ALJ's decision is not supported by substantial evidence and that the ALJ did not follow proper legal procedures.

---

[57]    Tr. 23.

[58]    Tr. 23-24.

[59]    Tr. 24.

[60]    Tr. 24.

[61]    Tr. 24, 25.

[62]    Tr. 24, 25.

13

Specifically, Plaintiff argues that the ALJ failed to enlist the services of a medical expert in evaluating Plaintiff, failed to take into account Plaintiff's loss of near visual acuity, thereby posing an incomplete hypothetical question to the VE and, having failed to appreciate the extent of Plaintiff's functional restrictions, also failed to reconcile the discrepancy between the testimony of the VE and the functional requirements in the Dictionary of Occupational Titles ("DOT").

In response, Defendant argued the ALJ correctly assessed Plaintiff's residual functional capacity and credibility, and the ALJ's step four determination was supported by substantial evidence.

## A.   Plaintiff's Primary Argument

Plaintiff's first three arguments contend that the ALJ erred when he failed to enlist the services of a medical expert in evaluating the plaintiff's ophthalmologic examination findings, thus failed to take into account Plaintiff's loss of near visual acuity, and therefore posed an incomplete hypothetical to the VE.[63] Specifically, Plaintiff argues that the ALJ did not give sufficient weight to Dr. Hyman's ophthalmologic examination of March 29, 2002, which noted Plaintiff's Jaeger scale result as a "10".[64]  Plaintiff

---

[63]     Memorandum of Points and Authorities In Support of Plaintiff's Motion For Summary Judgment, Docket Entry No. 16 ("Plaintiff's Memorandum") at 4.

[64]     A Jaeger test consists of "Jaeger test type" (defined as ordinary printer's type, as opposed to block letters in Snellen test type) of seven different sizes printed on a card and used in testing near vision.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1818 (29th Ed. 2000).

14

represents that such a finding is an indicator of a significant compromise of near visual acuity.[65]

Generally, an ALJ owes a duty to a disability benefits claimant to fully and fairly develop the record. Kane v. Heckler, 731 F.2d 1216, 1219 (5th Cir. 1984); Brock v. Chater, 84 F.3d 726, 728 (5th Cir. 1996) (citing Kane, 731 F.2d at 1219). When the ALJ fails to do so, he does not have sufficient facts necessary to make a decision based on substantial evidence. Kane, 731 F.2d at 1219. However, the Fifth Circuit has held that failure to develop an adequate record is not ground for reversal, per se. Id. at 1220. The claimant must also show that he was prejudiced by the failure to fully develop the record. Id. To show prejudice, he must show that "had the ALJ done his duty, she could and would have adduced evidence that might have altered the result." Id.

The regulations do not mandate that the ALJ ask for and consider opinions from medical experts. See 20 C.F.R. § 404.1527(c); McGee v. Weinberger, 518 F.2d 330, 332 (5th Cir. 1975). However, the ALJ must consider every medical opinion in the record, with more weight given to medical sources who had examining relationships with the claimant. 20 C.F.R. 404.1527(d); Social Security Ruling ("SSR") 96-6p, at *2 (S.S.A. 1996), available at 1996 WL 347180. The regulations and Fifth Circuit law permit the ALJ to weigh the opinions of all medical sources in the record.

---

[65]    Plaintiff's Memorandum at 4.

See 20 C.F.R. 404.1527(c); Greenspan, 38 F.3d at 237; Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2001); Carrier v. Sullivan, 944 F.2d 243, 247 (5th Cir. 1991). Furthermore, an ALJ may discount the weight of a medical opinion relative to other medical opinions when the evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by other evidence. Newton v. Apfel, 209 F.3d 448, 456 (5th Cir. 2000); see also SSR 96-6p, 1996 WL 347180, at *3.

The Fifth Circuit has held that a consultative examination is not required unless the record establishes that it was necessary to allow the ALJ to make the disability determination. Turner v. Califano, 563 F.2d 669, 671 (5th Cir. 1977); Brock v. Chater, 84 F.3d 726, 728 (5th Cir. 1996). A consultative examination becomes necessary only when the claimant presents sufficient evidence to raise a suspicion of a non-exertional requirement. Jones v. Bowen, 829 F.2d 524, 526 (5th Cir. 1986). However, isolated comments by claimants are insufficient to raise a suspicion without further support. See Pierre v. Sullivan, 884 F.2d 799, 802-03 (5th Cir. 1989). Extrapolating from these cases, the Fifth Circuit has held that an ALJ is not required to have a medical expert testify, and that it is not reversible error unless the claimant can prove that such an exclusion was prejudicial. See Glover v. Barnhart, No. 03-20469, 81 Fed. Appx. 513, 515 (5th Cir. Dec. 2, 2003) (not selected for publication in the Federal Reporter); Atkins v. Barnhart, No.

16

04-30447, 119 Fed. Appx. 672, 674-75 (5th Cir. Jan 18, 2005) (not selected for publication in the Federal Reporter); White v. Soc. Sec. Admin., No. 04-30760, 129 Fed. Appx. 905, 906 (5th Cir. May 3, 2003) (not selected for publication in the Federal Reporter).

With all the evidence at hand, the ALJ must consider all of a claimant's symptoms as well as the extent to which the symptoms can be reconciled with the objective medical evidence and other evidence. See 20 C.F.R. § 404.1529(a).

Plaintiff's argument fails for a number of reasons. First, as noted earlier, a medical expert is not required unless Plaintiff could show that the record was not fully developed. Second, although there was no medical expert present at the hearing, the record shows that Dr. Gregg completed an RFC assessment of Plaintiff.[66] The record indicated that Plaintiff's near visual acuity was correctable and that his impairment was "non-severe".[67] The record did not lack the substantial evidence necessary for the ALJ to make a disability determination. Third, Plaintiff points to no additional evidence that, had the ALJ developed the record further, would have been adduced at the hearing and could have changed the result. Instead, Plaintiff only argues that the evidence at hand should have been weighed differently, arguing that not only was another medical opinion concerning the data necessary,

---

[66]     Tr. 97.

[67]     Tr. 97.

17

but that this additional expert opinion would have changed the result.[68]   Specifically, Plaintiff separates out his issue of impaired near visual acuity from his overall vision and, for that matter, the rest of his medical record as a whole.  Because the ALJ did not specifically single out and focus on that issue, Plaintiff claims, his decision was not based on substantial evidence.[69]

Plaintiff's only evidence for his contention of a non-correctable near visual acuity impairment is the Jaeger score reported by Dr. Hyman, which, according to Plaintiff, seems to be the only and controlling measure of near visual acuity.  However, there were several other eye examinations which contradicted the Jaeger score.  Plaintiff's own optometrist, Dr. Diab, stated that Plaintiff's near vision was correctable to 20/20.[70]  Eye exams given by Dr. Pickering and by the Texas Eye Institute stated that Plaintiff's near vision was correctable to 20/30.[71]  In all cases, Plaintiff received a prescription for corrective lenses.  Finally, Dr. Gregg's RFC assessment, based on his review of Plaintiff's record, noted that: (1) Plaintiff had a non-severe visual impairment; (2) Plaintiff's correctable vision was 20/30; and (3) there was no objective clinical evidence to support the alleged

---

[68]   Plaintiff's Memorandum 4-5.

[69]   Plaintiff's Response to Defendant's Motion for Summary Judgment ("Plaintiff's Response") 1-3.

[70]   Tr. 89.

[71]   Tr. 100, 105.

limitations as to Plaintiff's "visual field restriction."[72]   Dr. Gregg's conclusion was supported by a telephone conversation he had with Dr. Hyman, wherein Dr. Hyman stated "that there were no objective clinical findings that would support the apparent visual field restriction for the left eye."[73]   Though Plaintiff focused on the Jaeger score in Dr. Hyman's report, the ALJ considered and gave more weight to Dr. Gregg's opinion which was based, in part, on a telephone discussion with Dr. Hyman and other data available to him.

Given the above evidence, including the fact that Plaintiff received prescriptions for corrective lenses, and Dr. Gregg's RFC assessment, the ALJ's determination that Plaintiff's near visual acuity impairments were not severe was supported by more than a scintilla of evidence.   In light of the foregoing, the court finds that the ALJ acted within his discretion, having properly relied on and weighed the medical opinions in the complete record before him, his decision was based on substantial evidence and that Plaintiff raised no new medical issue or question not already considered by the ALJ that would have necessitated calling another expert witness to render another opinion.

Plaintiff further alleged that in making his disability determination, the ALJ interpreted the raw medical data on his own

---

[72]    Tr. 97.

[73]    Tr. 98.

instead of properly relying on an expert medical opinion.  To
support this argument, Plaintiff relies on two First Circuit cases,
Manso-Pizzaro v. Sec'y of Health & Human Serv., 76 F.3d 15, 17 (1st
Cir. 1996), and Berrios Lopez v. Sec'y of Health & Human Serv., 951
F.2d 427, 429 (1st Cir. 1996).[74]  These two cases, though not
controlling, suggest that an ALJ, as a layman, should not use the
raw medical data to determine the residual functional capacity.
See Manso-Pizarro, 76 F.3d at 17; Berrios Lopez, 951 F.2d at 429.

    A comparison of the instant case with the two cited cases
shows that the ALJ did not evaluate the raw medical data as
alleged.   The court in Manso-Pizzaro noted that given the
"illegibility of non-trivial parts of the medical record, coupled
with identifiable diagnoses and symptoms that seem to indicate more
than mild impairment, we believe the record alerted the ALJ to the
need for expert guidance regarding the extent of the claimant's
residual functional capacity to perform her particular past
employment." 76 F.3d at 19.

    In the instant case, the medical record is not unclear to the
extent it was in Manso-Pizzaro, with no medical opinions but just
raw data.  Instead, this claimant has several medical opinions from
examining physicians, a factor missing in Manso-Pizzaro.  At least
one of these opinions analyzed the very information to which
Plaintiff points in support of his claim and included a statement

---

[74]     Plaintiff's Memorandum at 5; Plaintiff's Response at 2.

from Dr. Hyman which contradicted Plaintiff's present position. Taken as whole, these medical opinions, the majority of which concluded that Plaintiff's visual impairment was correctable, provided the ALJ with expert guidance which was lacking in Manso-Pizzaro. Under the Manso-Pizzaro standard, then, the ALJ properly relied on those opinions.

In Berrios Lopez, that court found that because the report of the consulting medical expert "at least briefly mentions all of claimant's alleged impairments and states medical conclusions as to each," the ALJ was entitled to give such an opinion evidentiary weight. 951 F.2d at 431. Furthermore, that court noted that even if a dispute existed as to the extent claimant's conditions affected his RFC, the record as a whole contained "ample" evidence to support the ALJ's conclusion and there was no need for an "on the spot" examination of the claimant by the medical expert. Id. at 432.

Using the same reasoning in this case, there existed substantial evidence in the record to support the ALJ's decision, including Dr. Hyman's overall assessment of Plaintiff's near visual acuity impairment. The court, therefore, finds that the ALJ did not improperly interpret the raw medical data as Plaintiff argued.

Plaintiff has not made any showing that he was prejudiced by the ALJ's failure to further develop the record. From the record as a whole, including uncontested evidence of Plaintiff's cardiac and hand conditions, Plaintiff has failed to show that had the ALJ

21

employed a medical expert to render an additional opinion at the hearing that the result would have been any different.

Because this court finds that the ALJ's determination of Plaintiff's residual functional capacity was based on substantial evidence, the ALJ was justified in excluding Plaintiff's alleged near visual acuity problems from the hypothetical posed to the VE, and, therefore, the ALJ properly relied on the VE's expert testimony that Plaintiff could perform his past relevant work as a dental technician.  Boyd v. Apfel, 239 F.3d 698,706-07 (5th Cir. 2001) (citing Bowling, 36 F.3d at 436).

**B.  Plaintiff's Second Argument**

Plaintiff's other argument is that the ALJ failed to recognize the discrepancy between the testimony of the VE and the functional requirements in the DOT.  Plaintiff's complaint is essentially that the VE's testimony is unreliable because it conflicts with the DOT job descriptions and, therefore, the ALJ erred by depending upon it.  The Fifth Circuit provided guidance on this issue in Carey v. Apfel, 230 F.3d 131 (5th Cir. 2000).  In Carey, the court held that if an indirect conflict arises between the VE's testimony and the DOT job descriptions, the ALJ may properly rely on the VE's testimony provided the record reflects an adequate basis for doing so.  Id. at 146.

The court notes initially that the DOT's role in disability determinations is limited because the DOT does not purport to cover

every specific skill or qualification for a particular job. <u>Fields</u>
<u>v. Brown</u>, 805 F.2d 1168, 1171 (5th Cir. 1986).  Instead, it simply
provides a general description of the exertional requirements and
duties of that job.  <u>Id.</u>  In contrast, a vocational expert is
"familiar with the specific requirements of a particular
occupation, including working conditions and the attributes and
skills needed" and can therefore reach a reasoned conclusion as to
whether a claimant's particular restrictions prevent him from
performing a certain job.  <u>Id.</u>  As a result of this distinction,
"the DOT job descriptions should not be given a role that is
exclusive of more specific, vocational expert testimony with
respect to the effect of an individual claimant's limitations on
his or her ability to perform a particular job." <u>Carey</u>, 230 F.3d
at 145.

    With this framework in mind, the court finds that no actual
conflict exists between the VE's testimony and the DOT that is
sufficiently material to the outcome of this matter.  The DOT does
not customize its job descriptions to a claimant's particular
restrictions; instead, it only provides a general description of
the exertional requirements and duties of that job.  It is the VE's
job to take into account the claimant's limitations and determine
whether the claimant is able to perform a certain job.

    In <u>Carey</u>, the court noted that the alleged conflict between
the VE's testimony and the DOT "actually reduce[d] to a factual
disagreement about whether a person with one arm can perform a job

23

requiring some degree of manual dexterity and fingering." <u>Carey</u>, 230 F.3d at 146. This is analogous to what Plaintiff claims now. Instead of the question at issue being whether a one-armed person can perform a job requiring some degree of manual dexterity and fingering, here we have the question of whether a person with monocular vision can perform a job requiring visual attention and focus on small objects. In answering the hypothetical posed by the ALJ, the VE answered that question in the affirmative.[75] Plaintiff's counsel posed a question to the VE on the possible dangers posed by the machinery used by dental technicians and by the need to work with small pieces and how that would relate to Plaintiff's monocular vision.[76] The VE answered that he did not think that use of high speed drills would be a danger for someone with monocular vision but that it might be harder for someone to work with small objects with monocular vision than with binocular vision.[77] Plaintiff's counsel also asked the VE the same question with respect to the medical conditions claimed by Plaintiff.[78] Though the VE conceded that if someone had unstable monocular vision, the job would be difficult to perform,[79] he correctly refused to come to a medical conclusion as to whether Plaintiff

---

[75]    Tr. 195.

[76]    Tr. 198-99.

[77]    Tr. 199.

[78]    Tr. 197.

[79]    Tr. 199.

actually had the claimed conditions.[80]

Additionally, Plaintiff's counsel in effect questioned the VE about whether the job of dental technician was truly "light" since Plaintiff would be occasionally required to lift 50 pounds.[81] Plaintiff's counsel did not dispute the VE's statements that in the DOT the Department of Labor considered the occupation light work, that the exertional requirements were determined based on the overall or average exertional levels, and that occasional lifting in excess of such exertional levels did not change that assessment.[82]

However, even if an actual conflict were present, the court finds an adequate basis in the record supporting the ALJ's reliance upon the VE's testimony.  The record indicates that the ALJ reasonably incorporated all of Plaintiff's limitations into the hypothetical question posed to the VE, including Plaintiff's visual impairments and cardiac condition.  In his decision, the record shows that the ALJ properly took into account Plaintiff's limitations when determining Plaintiff's residual functional capacity, including the limitation that Plaintiff avoid exposure to dangerous machinery.[83]  As a result, the VE was able to accurately assess whether Plaintiff could perform his past relevant work.

---

[80]    Tr. 197, 199.

[81]    Tr. 196.

[82]    Tr. 196.

[83]    Tr. 25.

Further, the VE even went beyond what was required and noted that alternative jobs were available, with only a moderate adjustment necessary, in the local and national economies that Plaintiff could perform at the same light exertional level, namely those as order or supply/requisition clerks.[84]  In conclusion, the court finds the ALJ properly relied on the VE's testimony at the hearing and therefore employed proper legal standards when making the disability determination.  Boyd, 239 F.3d at 706-07.

The court recognizes the seriousness of Plaintiff's medical condition.  However, the court can only review the record with an eye toward determining whether the ALJ's decision is supported by more than a scintilla, but less than a preponderance of evidence. See Carey, 230 F.3d at 135.  The court finds more than a scintilla of evidence in support of the ALJ's decision.  Furthermore, the court finds that the ALJ applied the correct legal standards in forming his decision.  Therefore, the court cannot overturn the decision of the ALJ, who is given the task of weighing the evidence and deciding disputes.  See Chambliss, 269 F.3d at 522; Carrier, 944 F.2d at 247.  In light of the deferential standard of review which this court must apply, the court cannot re-weigh the evidence and cannot overturn the ALJ's decision if it is supported by substantial evidence, as it is here.  See Johnson, 864 F.2d at 347.

**C.    Defendant's Argument**

---

[84]     Tr. 200.

Defendant asserts that the ALJ's decision should be affirmed because he properly determined Plaintiff was never under a disability during the time period in question.[85]  In this instance, the issue is whether Defendant met her burden at step four of the sequential analysis of proving Plaintiff was able to perform relevant past work as a dental technician.  For the reasons stated above, the court finds that Defendant satisfied her burden.  As a result, the ALJ's decision finding Plaintiff was not disabled is supported by substantial record evidence, and the court also agrees with Defendant that the ALJ applied proper legal standards in evaluating the evidence and in making his determination.

### IV. Conclusion

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is **DENIED** and Defendant's Motion for Summary Judgment is **GRANTED**.

SIGNED in Houston, Texas, this 8th day of August, 2005.

Nancy K. Johnson
United States Magistrate Judge

---

[85]     The Commissioner's Memorandum in Support of Motion for Summary Judgment ("Defendant's Brief"), Docket Entry No. 18.